# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50414 | **DATE** | 10/23/2001 |
| **CASE TITLE** | McNew vs. Massanari | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached, it is the magistrate's Report and Recommendation that Plaintiff's motion for summary judgment be granted and the decision of the Commissioner be reversed and this matter be remanded for a calculation of benefits. It is further recommended that Defendant's motion for summary judgment be denied. Parties are given ten days from service of this order, as calculated under Rule 6, to appeal to Judge Philip G. Reinhard, pursuant to Rule 72 of the Federal Rules of Civil Procedure.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | OCT 23 2001 | | 18 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 10/23/2001 | |
| ✓ | Copy to judge/magistrate judge. | | | date mailed notice | |
| tml | courtroom deputy's initials | 2001 OCT 23 PM 3:14 CLERK U.S. DISTRICT COURT Date/time received in central Clerk's Office | | ss mailing deputy initials | |

DERBIN C. McNEW,          )

                              )

Plaintiff,              )       Case No.  00 C 50414

                              )

v.                 )       Philip G. Reinhard

                              )       P. Michael Mahoney

LARRY G. MASSANARI,    )

ACTING COMMISSIONER OF    )

SOCIAL SECURITY,         )

                              )

Defendant.           )

## REPORT AND RECOMMENDATION

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB) pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C. §636(b)(1)(B).

## I. BACKGROUND

Plaintiff applied for DIB on February 23, 1995, alleging disability since November 12, 1994. (Tr. 69-72). On June 7, 1995, Plaintiff's request for benefits was denied by the Social Security Administration (SSA). (Tr. 84-87). Plaintiff filed a request for reconsideration on June 27, 1995. (Tr. 88-89). Plaintiff's request for reconsideration was denied by the SSA on September 21, 1996. (Tr. 91-93). On September 29, 1995, Plaintiff filed a request for an administrative hearing. (Tr. 94). Plaintiff appeared, with counsel, at a hearing before an Administrative Law Judge (ALJ) on August

28, 1996. (Tr. 202). Plaintiff was informed by a decision dated November 20, 1996, that he was not eligible for benefits. (Tr. 198-210). On December 5, 1996, Plaintiff submitted a request for review of the hearing decision to the Appeals Council. (Tr. 214-216). On June 23, 1998, the Appeals Council vacated the hearing decision and remanded Plaintiff's case to an ALJ for further proceedings pursuant to 20 C.F.R. §404.970). (Tr. 220-221). Plaintiff, represented by a non-attorney advocate, then appeared before an ALJ for another hearing on December 15, 1998. (Tr. 36-68). In a hearing decision issued on February 19, 1999, the ALJ found that Plaintiff was not eligible for DIB. (Tr. 11-24). On March 1, 1999, Plaintiff submitted a request for review to the Appeals Council. (Tr. 10). On September 28, 2000, the Appeals Council denied Plaintiff's request for review. (Tr. 6-7). On November 20, 2000, Plaintiff filed the instant action.

## II.    <u>FACTS</u>

Plaintiff was born on February 4, 1940, and was fifty-eight years old at the time of his December 15, 1998, hearing before the ALJ. (Tr. 39). Plaintiff had completed his education through the twelfth grade and had stopped working on November 12, 1994, due to job stress. (Tr. 39). Plaintiff had been employed by the Chrysler Corporation for about thirty years, the last fifteen of which he spent as a parts inspector. (Tr. 39-40). At his first hearing, Plaintiff testified that his daily activities consisted of gardening, walking, boating, playing cards and watching TV. (Tr. 40). Plaintiff testified that he did his own cleaning, dusting, vacuuming and laundry and that he did visit with friends and family. (Tr. 40-41). Plaintiff stated that the most stressful thing for him was being alone in his house. (Tr. 40). At that time, there was some evidence of alcohol use, but Plaintiff indicated that he had not had a drink since November 1994. (Tr. 40).

At the December 1998 hearing, Plaintiff testified that he stopped working due to symptoms

of stress which included dizziness, aches, pains and muscle cramps. (Tr. 46). Plaintiff testified that

he can alleviate the symptoms of the attacks by going for a walk or concentrating on something else

but if he isn't able to do that the attacks may last all day. (Tr. 46-47). Plaintiff stated that the

frequency and severity of the attacks had decreased since he stopped working but that he did

experience some symptoms every day. (Tr. 49). Plaintiff stated that he no longer feels like

gardening, that he has become forgetful, that he occasionally shops but that often his ex-wife shops

for him and that his ex-wife keeps his checkbook for him. (Tr. 48-49). Plaintiff claimed that while

he still owned a boat, he had not been boating the previous year because he did not want to. (Tr. 50).

Plaintiff spends most of his day exercising, watching TV and "piddling around the house". (Tr. 51).

Plaintiff claimed that he is sometimes unable to finish tasks due to muscle weakness which he has

been told by his doctor is caused by anxiety. (Tr. 51-52). At the time of the hearing Plaintiff was

living with his ex-wife and stated he had been living with her for at least a year. (Tr. 55). Plaintiff

stated that his panic attacks had gotten better since living with his ex-wife as she had taken some

pressure off him and he then had someone to talk to which helped. (Tr. 55). Plaintiff testified that

his panic attacks were less frequent when he had something to do and it is when he has nothing to

do that he gets the attacks. (Tr. 56). However, Plaintiff stated that he could not handle full-time

work and if he went back to work he'd probably go over the edge again because there is no job that

does not cause some stress. (Tr. 56). In response to questions by the ALJ, Plaintiff testified that he

was hospitalized in November 1994 and at that time he was having problems with alcohol as well

as stress related to his personal life. (Tr. 57-58). Plaintiff stated that after leaving the hospital he

attended AA meetings several time each week until about a year before the hearing when he stopped

attending the meetings because they made him nervous and stressful. (Tr. 58). In response to

questions by the ALJ, Plaintiff stated that while his anxiety level was not as high as it had been when he stopped working in 1994, it had not decreased in the past two years. (Tr. 66).

Vocational expert, Frank Mendrick appeared before the ALJ at Plaintiff's December 1998 hearing. (Tr. 59). Mr. Mendrick testified that Plaintiff's past work was at the medium exertional level, that he was occasionally lifting fifty pounds and that the work was categorized as semi-skilled. (Tr. 60). Mr. Mendrick stated that Plaintiff's past job as an automobile parts inspector was classified as a moderate stress position. (Tr. 60). In response to the ALJ, Mr. Mendrick stated that he had, at the previous hearing, identified other jobs, such as janitor, grounds keeper and general laborer, that would involve less stress than the parts inspector position. (Tr. 60).

### III.  **MEDICAL HISTORY**

A Psychiatric Review Technique Form (PRTF) was completed on May 20, 1995, by D. Hudspeth, Psy.D. (Tr. 75-83). Dr. Hudspeth found that Plaintiff suffered from an anxiety disorder, characterized by a generalized persistent anxiety and autonomic hyperactivity with a history of panic attacks, and a substance addiction disorder. (Tr. 75, 79). No evidence was found to indicate that Plaintiff suffered from an organic mental disorder, schizophrenic, paranoid and other psychotic disorder, an affective disorder, mental retardation or autism, a somatoform disorder or a personality disorder. (Tr. 75-81). Dr. Hudspeth found that Plaintiff was slightly limited in his activities of daily living and in social functioning and that he often experienced deficiencies of concentration persistence or pace. (Tr. 82).

On September 28, 1994, Plaintiff underwent a stress EKG test at Saint Joseph Hospital in Belvidere, Illinois. (Tr. 133-134). Plaintiff had been complaining of episodic substernal discomfort and epigastric distress that had, at times, come up with exercise. (Tr. 133). The test was reportedly

4

negative for ischemia and Plaintiff was encouraged to distract himself from the symptoms when they arose to see if they would resolve spontaneously and return to the clinic for further testing if they did not do so. (Tr. 134).

Plaintiff was seen at Saint Anthony Medical Center in Rockford, Illinois on November 15, 1994. (Tr. 138-141). Plaintiff complained of being nervous and jittery with a poor appetite, pain in the right arm and frequent urination. (Tr. 141). Plaintiff was diagnosed with an anxiety syndrome and given a prescription for Xanax. (Tr. 140). Several days later, on November 18, 1994, Plaintiff was admitted to Highland Hospital in Belvidere, Illinois. (Tr. 143-147). Plaintiff was diagnosed with chemical dependency and alcoholism as well as situational anxiety and depression, irritable bowel syndrome and gastritis. (Tr. 143). The admitting physician was Kent Hess, MD. (Tr. 143). Treatment notes indicate that Plaintiff reported he had been drinking heavily for years and had been drinking a six pack of beer a day and a case of beer on weekends. (Tr. 144). Plaintiff reported that he had been married twice to the same woman and had two children. (Tr. 144). The records indicate that Plaintiff had lived with his girlfriend for the last six to seven years and that she had moved out three times, the last time just two months ago. (Tr. 144). Plaintiff successfully completed detoxification, was prescribed Pepcid and Bentyl and was discharged on November 21, 1994. (Tr. 143-147).

Between November 29, 1994, and December 15, 1995, Plaintiff was treated frequently by Dr. Hess. (Tr. 150-159). On November 29, 1994, Plaintiff reported to Dr. Hess that he had increasing anxiety and panic attacks and was experiencing difficulty in speaking and sleeping. (Tr. 150). Plaintiff indicated that his mind was racing and that he had that problem for years and the alcohol had helped. (Tr. 150). Dr. Hess noted that Plaintiff was markedly anxious and prescribed

5

Imipramine. (Tr. 150). On December 19, 1994, Plaintiff again saw Dr. Hess and informed him that he was unable to tolerate the Imipramine. (Tr 150). Dr. Hess changed Plaintiff's prescription to Buspar. (Tr. 151). On January 19, 1995, Plaintiff saw Dr. Hess because he was unable to tolerate the Buspar. (Tr. 151). He informed Dr. Hess that he was also being treated by Dr. Giakas and had been prescribed Trazadone, Zoloft and Klonopin and that his anxiety was greatly decreased. (Tr. 151). Dr. Hess prescribed Plaintiff Prilosec in place of the Pepcid as well as Levsinex. (Tr. 151). Plaintiff saw Dr. Hess on January 20, 1995, for a hemorrhoid. (Tr. 151). Dr. Hess examined Plaintiff on February 21, 1995, and reported that Plaintiff still appeared anxious but that Plaintiff reported that he felt better. (Tr. 153). Plaintiff also reported that he did not have a counselor to address his anxiety issues but was going to AA meetings and had not relapsed with regard to his alcoholism. (Tr. 152). Plaintiff was seen by Dr. Hess on March 22, 1995, but those notes are not legible, Plaintiff was then seen on April 21, 1995, and Dr. Hess reported that Plaintiff was bored and suffered low self-esteem by not being able to work, but that he was interacting better and had not had any significant panic attacks. (Tr. 153). On May 22, 1995, Dr. Hess reported that Plaintiff was having some nausea from the medication, had had a panic attack, and that he appeared anxious and his speech was pressured. (Tr. 154). Plaintiff saw Dr. Hess on June 20, 1995, and reported that his nausea was better but that he was having some memory loss, balance problems, possibly related to his medication, that he was still attending AA meetings and that he was going to outings with his ex-wife and children. (Tr. 154). On July 18, 1995, Plaintiff reported to Dr. Hess that Dr. Giakas was weaning him off the Zoloft because it was causing severe headaches. (Tr. 155). Plaintiff stated that the headaches and balance problems were improving and that he was better outside than inside with people. (Tr. 155). Dr. Hess reported that Plaintiff remained quite anxious. (Tr. 155). On August 15, 1995, Plaintiff reported that

his self-esteem was better, that he was having fewer panic attacks and that he was spending more time with his family. (Tr. 156). Dr. Hess noted that Plaintiff's affect appeared normal. (Tr. 156). Plaintiff saw Dr. Hess on September 12, 1995, and reported that he had been much more nervous that month and that he would probably be retiring at the end of October. (Tr. 157). On October 10, 1995, Plaintiff reported to Dr. Hess that he was still quite anxious and was having some right-sided lower back pain. (Tr. 158). In Dr. Hess' notes of November 13, 1995, he notes that Plaintiff's anxiety was improving and the he was feeling better about himself. (Tr. 159). On December 15, 1995, Dr. Hess noted that Plaintiff continued to slowly improve and was trying to avoid stressful situations. (Tr. 159). Plaintiff was seen again by Dr. Hess on January 18, 1995, February 15, 1996, and March 22, 1996. (Tr. 196-197). On those occasions, Dr. Hess noted that Plaintiff was feeling good. (Tr. 197).

Treatment notes from March 1997 through September 1998 indicate that Plaintiff was seen by Dr. Hess on a monthly basis during that time. (Tr. 239-243, 260-265). Plaintiff saw Dr. Hess in March, April and May of 1997 with complaints of restless legs, anxiety attacks, right shoulder pain and a sore throat. (Tr. 264-265). On June 26, 1997, Plaintiff complained of increasing anxiety and reported to Dr. Hess that he was having stress because he was building a house and trying to sell his current home. (Tr. 263). Plaintiff saw Dr. Hess on August 26, 1997, and reported that he head moved back in with his ex-wife and that his anxiety was increasing, he was urinating frequently, losing weight, sleeps fine but if he is not busy has trouble living. (Tr. 263). On September 30, 1997, Plaintiff reported that he was jittery and that the Paxil made his stomach jittery, that he had some pain in his right knee and shoulder and was still working on his house. (Tr. 262). On October 28, and November 25, 1997, Plaintiff complained that the Paxil did not have any positive effect and that

his anxiety only improved when he worked hard during the day. (Tr. 262). Plaintiff saw Dr. Hess on December 30, 1997 and reported that he was feeling fairly good in the morning but that he is more anxious in the afternoon and evening because he is unable to do anything and on January 29, 1998, Plaintiff reported that he was feeling less anxious due to the Tegretol. (Tr. 260). In February and March of 1998, Plaintiff was treated by Dr. Hess for bursitis in his right elbow and he reported that his anxiety was controlled and stable. (Tr. 239). On May 4, 1998, Plaintiff reported to Dr. Hess that his anxiety with panic attacks was fairly well controlled and is worse if he just sits around. (Tr. 240). Plaintiff again reported that his anxiety was stable on July 6, 1998, and that he was experiencing itchiness in his eyes. (Tr. 241). On September 8, 1998, Plaintiff reported that he was experiencing increased anxiety, fatigue and shaking and had an episode of syncope. (Tr. 241). Dr. Hess ordered a check of medication levels. (Tr. 242). Plaintiff was re-checked on September 15, 1998, his blood levels were normal and he stated he still had muscle cramping, anxiety and panic. (Tr. 242). On September 29, 1998, Plaintiff reported that he was still experiencing the muscle cramping and stated he was unable to function very well. (Tr. 243).

On March 21, 1995, Dr. Hess completed a psychiatric report for the Bureau of Disability Determination Services. (Tr. 169-171). On that form, Dr. Hess indicated that Plaintiff suffered from anxiety and panic attacks as well as alcoholism in remission. (Tr. 171). Dr. Hess indicated that Plaintiff had difficulty performing tasks but was able to care for himself, his mood and affect were good and he had appropriate interpersonal relationships and that his ability to perform work related tasks was "probably poor at this time." (Tr. 170-171).

On September 15, 1998, Dr. Hess completed an affective disorder questionnaire, and anxiety related disorder questionnaire and a Medical Assessment of Ability to Do Work Related Activities -

Mental. (Tr. 231-238). Dr. Hess found Plaintiff suffered from a depressive syndrome characterized by sleep disturbance and difficulty concentrating or thinking resulting in marked restrictions in activities of daily living, moderate restrictions in social functioning, he often experiences deficiencies in concentration, persistence or pace and has experienced repeated episodes of decompensation or deterioration that would interfere with his ability to maintain reliable attendance in performing job duties. (Tr. 231-233). Also, that Plaintiff suffered from an anxiety related disorder with persistent generalized anxiety characterized by motor tension and apprehensive expectations as well as recurrent sever panic attacks resulting in marked limitations in activities of daily living, moderate restrictions in social functioning, that Plaintiff often experiences deficiencies of concentration, persistence or pace and has experienced repeated episodes of decompensation. (Tr. 236-237). Dr. Hess noted that Plaintiff was able to function independently outside of the home but that his symptoms would interfere with his ability to maintain reliable attendance in performing job duties. (Tr. 238). Dr. Hess found that Plaintiff had poor abilities to deal with work stresses and maintain attention, that he had fair abilities to function independently, deal with changes in the work setting, follow work rules, relate to co-workers and the public and interact with supervisors and good abilities to use judgment. (Tr. 234). Dr. Hess noted that Plaintiff is able to function socially if not put into situations of increasing anxiety but that he is unable to carry out simple or detailed tasks as they cause an increase in anxiety. (Tr. 235).

On April 29, 1995, Dr. Delsie Gavali completed a psychiatric evaluation of Plaintiff. (Tr. 173-175). Dr. Gavali noted that Plaintiff was extremely nervous, constantly moving around and complaining that he felt jittery, had headaches, abdominal pain, cramps and some insomnia. (Tr. 173). The social history Plaintiff reported to Dr. Gavali indicates that Plaintiff served in Vietnam

and was honorable discharged. (Tr. 174). Plaintiff is the third eldest of five children and had a stable family life. (Tr. 174). Plaintiff was married to and divorced from the same woman twice and they have two children together. (Tr. 174). Plaintiff has worked at Chrysler for nearly thirty years. (Tr. 174). Dr. Gavali noted that Plaintiff's grooming was fair, he was oriented, there were no thought disorders and Plaintiff appeared extremely nervous. (Tr. 174). Plaintiff reported that he was nervous and worries a lot on some days but does not have any obsessions or rituals, has some short term memory loss and is sleeping better with medication. (Tr. 174). Dr. Gavali found Plaintiff to be suffering from a panic disorder, alcohol abuse, avoidant personality and stress from being alone. (Tr. 175). Dr. Gavali indicated with respect to Global Assessment of Functioning that Plaintiff had rated at 70 in the past and currently rated at 40. (Tr. 175).[1] Dr. Gavali indicated that Plaintiff does have a support system in his ex-wife , children and friends and would be able to manage his funds. (Tr. 175).

Plaintiff's records include a disability evaluation completed by Dr. Rizvi, a psychiatrist on August 2, 1995. (Tr. 164-165). Dr. Rizvi diagnosed Plaintiff with major depression, severe, non-psychotic with agoraphobia, a history of alcohol abuse and dependent personality. (Tr. 164). Dr. Rizvi found Plaintiff to be depressed and very anxious with low energy, anxiety in work and social situations and decreased libido. (Tr. 164). Dr. Rizvi noted that Plaintiff was unable to return to work. (Tr. 164).

---

[1] The GAF is reported on Axis V in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. The GAF scale rates social, psychological and occupational functioning on a scale of 1 through 100. A rating of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994).

10

On January 23, 1996, William Giakas, MD, psychiatrist, completed a Medical Assessment of Ability to Do Work Related Activities - Mental with regards to Plaintiff. (Tr. 166-167). Dr. Giakas found that Plaintiff had a good ability to relate to co-workers, fair abilities to follow work rules, deal with the public, use judgment, function independently and maintain concentration and poor abilities to deal with work stresses. (Tr. 166). Dr. Giakas noted that Plaintiff tended to have a low anxiety threshold and would become anxious, disorganized and desperate when stressed. (Tr. 166). Dr. Giakas reported that Plaintiff had good comprehension but was easily distracted, that he is moderately socially phobic and that has difficulty with activities that require sustained focus but that he would be capable of managing benefits in his own best interest. (Tr. 167). Dr. Giakas concluded that with respect to Plaintiff's ability to do work related activities, Plaintiff can understand instruction. (Tr. 179).

On May 20, 1998, Dr. Hudspeth, Psy.D. completed a Mental Residual Functional Capacity (RFC) Assessment with regards to Plaintiff. (Tr. 180-183). Dr. Hudspeth found Plaintiff to be moderately limited in his ability to understand and remember detailed instructions, his ability to carry out detailed instructions, his ability to interact appropriately with the general public and his ability to respond appropriately to changes in the work setting. (Tr. 180-181). Dr. Hudspeth did not find Plaintiff to be significantly limited in any other area of mental functioning. (Tr. 180-181). Plaintiff was found to be able to perform simple and routine tasks, he would be able to relate to supervisors and coworkers but would be uncomfortable dealing with the public. (Tr. 182).

Recently, Plaintiff was seen by Anthony D'Souza, MD, a psychiatrist, for problems with memory loss, anxiety and depression. (Tr. 267-284). Dr. D'Souza's treatment records indicate the he treated Plaintiff between January and February 1999. (Tr. 267-277). In those notes Dr. D'Souza

indicates that he believes Plaintiff suffers from depression, anxiety and dementia and that Plaintiff's previous alcohol abuse may be the cause of his dementia. (Tr. 268, 270-271). Dr. D'Souza also indicated that Plaintiff's tremors and shuffling gait may be early symptoms of a Parkinson's-like disease. (Tr. 269). Plaintiff reported to Dr. D'Souza that he had seen three other psychiatrists previously and that he had felt intimidated by Dr. Giakas. (Tr. 267). Dr. D'Souza noted that Plaintiff's cognitive functioning and immediate memory were poor and that he had no insight. (Tr. 270-271). On March 2, 2000, Plaintiff had an appointment with Dr. DiSanti to discuss finding a new psychiatrist. (Tr. 278). Plaintiff reported that he was not happy with Dr. D'Souza's diagnosis of alcohol related dementia. (Tr. 278).

Plaintiff was referred to Madhav Srivastava, MD, neurologist, for a determination as to whether he suffered from Parkinson's or a similar condition. (Tr. 293-297). On March 25, 1999, Dr. Srivastava examined Plaintiff and noted that he was anxious but alert and cooperative, had masking of the facial expression, normal speech, mild tremors, mild bradykinesia and walked with a short, shuffling gait. (Tr. 294). Dr. Srivastava indicated that many of Plaintiff's symptoms were probably due to underlying depression and anxiety and that possible parkinsonian features which may have been accentuated by his medication should be ruled out. (Tr. 294). Plaintiff was seen again by Dr. Srivastava on April 22, 1999. (Tr. 297). Dr. Srivastava indicated that an EEG had been performed showing evidence of diffuse cerebral disfunction but no evidence of Parkinson's and that Plaintiff appeared more alert and responsive with no bradykinesia. (Tr. 297). Dr. Srivastava reported that Plaintiff's overall condition was stable and that she suggested his medications continue to be decreased. (Tr. 297). On June 24, 1999, Dr. Srivastava indicated that Plaintiff's symptoms were due to dementia with underlying depression and anxiety. (Tr. 296). On April 20, 2000, Plaintiff was seen

by Terry Roth, MD, an associate of Dr. Srivatava's. (Tr. 293). Dr. Roth indicated that Plaintiff was experiencing progressive difficulty walking and getting up from a chair and that he occasionally had trouble initiating his gait. (Tr. 293). Dr. Roth noted that Plaintiff was alert and cooperative but slow in his answers with some facial masking and a flexed posture and gait. (Tr. 293). Dr. Roth concluded that Plaintiff was likely suffering from a Parkinsonian disease. (Tr. 293).[2]

## IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

---

[2] The records from Dr. DiSanti and Dr. Srivastava were not available to the ALJ at the time of the hearing and were submitted, after the ALJ's decision was issued, to the Appeals Council.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

14

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[3] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[4] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R.

---

[3]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[4]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

§ 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional

capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.     ANALYSIS

The court will proceed through the five step analysis in order.

A.     Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on February 19, 1999. (Tr. 20).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and forty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. Therefore, it is the magistrate's Report and Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

B.     Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments.  Specifically, the ALJ found Plaintiff suffers from anxiety and panic attacks. (Tr. 20).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. Therefore, it is the magistrate's Report and Recommendation that the ALJ's determination as to Step Two of the Analysis be affirmed.

C.     Step Three:  Does claimant's impairment meet or medically equivalent to an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 20). The ALJ found that Plaintiff's allegations of disabling symptoms and limitations were not fully credible. (Tr. 20).  The ALJ also determined that the medical evidence did not support Plaintiff's claims of disabling symptoms and limitations. (Tr. 16).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, it is the magistrate's Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be affirmed.

D.     Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. Therefore, it is the

magistrate's Report and Recommendation that the ALJ's determination as to Step Four of the Analysis be affirmed.

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

Once the ALJ determined that Plaintiff could not perform his past relevant work, he was required to establish in his opinion that the Commissioner had proven that Plaintiff has the capability of performing other work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). The ALJ determined that although Plaintiff's Residual Functional Capacity did not allow him to perform the full range of light work, there existed a significant number of jobs in the national economy that Plaintiff can perform. (Tr. 20). Specifically, the ALJ determined that Plaintiff retained the RFC to perform a limited range of heavy work, is classified as an individual of advanced age, has at least a high school education and does not have any transferable skills. (Tr. 20).

The ALJ's decision at Step Five is not supported by substantial evidence. In his hearing decision, the ALJ found that Plaintiff's medical evidence did not provide objective findings supporting his allegations of disabling symptoms and limitations. (Tr. 16). Initially, this court notes that the ALJ persistently cited to medical evidence that supported this determination, while failing to refer to or giving little weight to evidence that did support Plaintiff's allegations. The Seventh Circuit has stated that while an ALJ need not address every piece of evidence, he must build an accurate and logical bridge from the evidence to his conclusion. *Clifford* at 872. In this case, the ALJ by ignoring or giving little weight to much of the medical evidence failed to develop that bridge from evidence to conclusion.

The ALJ cites to treatment notes from Plaintiff's treating physician, Dr. Hess. (Tr. 17). In

19

referring to those notes, the ALJ reports that between August 1997 and May 1998, Plaintiff slept well, had difficulty with anxiety when he did not keep busy and that otherwise his anxiety and panic attacks were fairly well controlled. (Tr. 17). The ALJ reports that Dr. Hess' notes indicate that Plaintiff's anxiety has significantly improved with medication. (Tr. 18). Further, the ALJ rejected Dr. Hess' conclusions regarding Plaintiff's anxiety disorder because they were inconsistent with his treatment notes. (Tr. 18). The conclusions the ALJ refers to are found in several questionnaires Dr. Hess completed regarding Plaintiff's impairment. In an affective disorders questionnaire, Dr. Hess indicated that Plaintiff suffered from generalized persistent anxiety with motor tension and apprehensive expectation and recurrent severe panic attacks resulting in marked restrictions in activities of daily living, moderate difficulties in social functioning, deficiencies of concentration persistence or pace that occur often and repeated episodes of deterioration or decompensation. (Tr. 236-238). This court notes that those findings by Dr. Hess may support a finding that Plaintiff is disabled at Step Three pursuant to 12.06 of the Listings for anxiety disorders. In a questionnaire addressing Plaintiff's abilities to do work related activities, Dr. Hess indicated that Plaintiff's ability to deal with work stresses and understand, remember and carry out detailed but not complex job instructions were poor. (Tr. 257-258). This court's review of Dr. Hess' treatment notes refutes that ALJ's determination that Dr. Hess indicated that Plaintiff was improving. Dr. Hess' notes indicate that he treated Plaintiff from 1994 to 1998. (Tr. 149-163, 168-172, 196-197, 231-250 and 257-265). Those notes demonstrate that, except for several gaps, Plaintiff saw Dr. Hess on a monthly basis and Plaintiff's anxiety varied significantly from month to month. While Plaintiff reported that his anxiety had improved at some appointments, at approximately half of Plaintiff's improvements he reported that his anxiety had worsened . The ALJ cites Dr. Hess' March 1998 and May 1998 notes

where Plaintiff indicated that his anxiety had improved. However, Dr. Hess' notes from Plaintiff's three visits in September of 1998, when Plaintiff reported that he was experiencing increased anxiety and panic and that he was not able to function very well, sharply contradict the ALJ's finding that Plaintiff's anxiety was improving. (Tr. 242-243).

The ALJ also noted that "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Although the claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms." (Tr. 17-18). As stated above, this court has found that ALJ's review of the evidence to be incomplete and inaccurate. Dr. Hess' treatment notes do not indicate that Plaintiff's condition is being controlled by medication. The opposite is true. The medical evidence in the record indicates that Plaintiff's anxiety varies from month to month and that his medications were being altered on a regular basis due both to his intolerance of some of the drugs and the ineffectiveness of others. Further, records from Dr. DiSanti and Dr. Srivastava indicate that the medications may have been causing severe side effects such as parkinsonian symptoms and memory loss. (Tr. 267-298). Finally, this court notes that Plaintiff provided evidence of his having sought medical treatment for his impairment on a monthly basis since the onset in 1994. The ALJ's determination that Plaintiff had not sought the type of treatment expected for a totally disabled individual is clearly contradicted by Plaintiff's treatment records.

The ALJ also erred in his determination that there existed a substantial number of jobs in the national economy that Plaintiff could perform. Plaintiff's only impairment was non-exertional, precluding reliance by the ALJ on the Medical-Vocational Guidelines. 20 C.F.R. §404, Subpart P,

Appendix 2, 200.00(e). Therefore the ALJ utilized the assistance of vocational expert, Mr. Frank

Mendrick, to determine whether Plaintiff was capable of performing a substantial number of jobs

existing in the national economy. The ALJ's examination of Mr. Mendrick during the hearing

occupies no more than two pages of the hearing transcript. (Tr. 59-61). In response to the ALJ's

questions, Mr. Mendrick testified that Plaintiff's past work was medium exertional level, semi-

skilled work. (Tr. 60). Mr. Mendrick testified that Plaintiff's past work was in a moderate stress

position. (Tr. 60). Following that, the ALJ questioned Mr. Mendrick as to other jobs mentioned

during Plaintiff's first hearing:

> Q (ALJ) You identified some other jobs, such as janitor --
> A (VE) Um-hum.
> Q       Okay. And you indicated the last time, that there were no general deadlines
>         to be met and that the activities were varied?
> A       No. There -- there are deadlines, but it's not strictly a time limited activity for
>         X number of   pieces. You're supposed to clean the area, but again, it's not
>         a strict time limit. So, it's -- it's much more leisure work pace, Judge. Same
>         thing with the other jobs. (Tr. 60-61)

That exchange is, for the most part, the only exchange between the ALJ and Mr. Mendrick

addressing the existence of a substantial number of jobs in the national economy that Plaintiff is

capable of performing. The ALJ did not discuss Plaintiff's RFC with Mr. Mendrick. Mr. Mendrick

did not identify specific jobs that Plaintiff was capable of performing and how many such jobs

existed. In particular, there is no discussion regarding the effect of Plaintiff's advanced age and

limited education as well as his limited ability to cope with job stress on the occupational base. *See*,

SSR 85-15. For the purposes of review, the fact that the ALJ may have adequately addressed these

issues in the first hearing is not sufficient to support the Commissioner's burden at this step. This

court does not have the transcript from the first hearing before it and can therefore only guess as to

the information provided to and the conclusions drawn by the vocational expert at that time. There is no information in the records which would support the proposition that the Commissioner has carried his burden at this Step by demonstrating the existence of a substantial number of jobs in the national economy that Plaintiff is capable of performing.

The ALJ's decision at Step Five is not supported by substantial evidence. The Commissioner failed to carry its burden at Step Five. Therefore, it is the magistrate's Report and Recommendation that the ALJ's determination as to Step Five of the Analysis be reversed and remanded.

## VII.    CONCLUSION

For the above reasons, it is the Report and Recommendation of the Magistrate that Plaintiff's motion for summary judgment be granted and the ALJ's decision in this matter be reversed and remanded for a calculation of benefits. It is further recommended that Defendant's motion for summary judgment be denied. Parties are given ten days from service of this order, as calculated under Rule 6, to appeal to Judge Philip G. Reinhard, pursuant to Rule 72 of the Federal Rules of Civil Procedure.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 10/23/01

23